# Exhibit C

Page 223

1      UNITED STATES DISTRICT COURT
2     FOR THE DISTRICT OF MASSACHUSETTS
3  LAUREN ROLLINS,
4       Plaintiff,
5    vs.              Civil Action No. 3:22-cv-30059
6  R STREET INSTITUTE,
7       Defendant.
8  -------------------------------x
9  (Contains confidential testimony)
10
11
12
13            CONTINUED DEPOSITION OF
14                 LAUREN ROLLINS
15               CONDUCTED VIRTUALLY
16              Friday, June 23, 2023
17                    9:08 a.m.
18
19
20
21
22            Laurie K. Langer, RPR
23
24

Page 290

**1**

REDACTED

**21**   Q.   Okay.  Now, on the first day of your deposition
**22**   you had indicated that part of your testimony was
**23**   impacted by the fact that you are neuro-divergent?
**24**   A.   I am.

Page 291

1    Q.   That was the term that you used?
2    A.   Yes.
3    Q.   And you just said that you are on the spectrum.
4  I just want to make sure I understand, because you've
5  now disclosed this.  You are on the autism spectrum?
6    A.   On the autism spectrum and ADHD.
7    Q.   And from your point of view, how does that impact
8  your ability to give truthful and accurate testimony?
9    A.   It makes me truthful to a fault.
10   Q.   Okay.
11   A.   Brutally honest is what it makes me.  That's --
12 and it makes me explain in great detail myself.  So
13 that -- because I understand that my communication style
14 is off-putting or poorly understood by neuro-typical
15 people.  And so I over-communicate as much of my actual,
16 you know, literal what I'm trying to do, so that there
17 is not miscommunication.
18         And I tend to do that in writing because, you
19 know, the fact that I don't look directly at people or
20 other parts of the way that I present socially or
21 present physically are misread by people who are used to
22 normal social conventions and behaviors.
23   Q.   Okay.  And I think in the first day it came up in
24 relation to chronology, basically, getting chronology,

1  chronological events right.  Is that a function of your
2  ADHD or autism diagnosis?
3     A.  So autism and ADHD particularly in women of my
4  age is poorly understood.  Because when I was a child
5  they didn't even think women could be autistic or have
6  ADHD.
7         And so those behaviors are frequently sort of
8  intertwined.  They present themselves in similar ways.
9  So in someways there isn't really, in people who likely
10 have both, it's very difficult to know if it's the ADHD
11 causing that or whether it's the way that I process.
12 And I process from the bottom up instead of a
13 neuro-typical person processes from the top down.
14        So that means I build upward as opposed to seeing
15 a giant thing and getting back down to the bottom.  That
16 makes it very difficult.  I don't track times.  So for
17 example, if you show me something visual and I see the
18 date in it, then I can place it around the feeling of
19 the time.  Like, I'll remember the sensory of being in
20 that meeting.  Essentially it's like having a
21 photographic memory as opposed to a, you know, one you
22 can pull data out of.
23    Q.  Okay.  And you -- I think you just testified that
24 one of the symptomology of your autism spectrum disorder

Page 293

1  diagnosis, if I'm saying that right, I'm not actually
2  sure it would be characterized as a disorder, but your
3  autism spectrum diagnosis is that you are brutally
4  honest and blunt; do I have that right so far?
5     A.   Those are features of non-stereotypical autism.
6  And also stereotypical autism.  I'm on the
7  non-stereotypical side.  Which means I don't
8  present -- I present more like someone who is typically
9  functioning.  Most of my internal processing happens
10 inside as opposed to someone who is stereotypical, will
11 repeat things over and over and over.  I do that in my
12 head.
13    Q.   I thought you had said that -- I thought I had
14 asked you how is that going to present itself in terms
15 of your testimony today and you said, "I'm brutally
16 honest to a fault"?
17    A.   To the best of my ability, yes.  But that's why
18 when you say would you classify a certain word a certain
19 way, no, I wouldn't.  That's not how I feel about it.
20    Q.   But is your sort of brutal honesty a
21 characteristic of your autism diagnosis?
22    A.   Yes.  It is a characteristic of most people on
23 the spectrum at any part.
24    Q.   And do you believe that you yourself are more

```
                                                        Page 294
 1    blunt than a neuro-typical individual?
 2       A.   Yes.
 3       Q.   And do you believe that your bluntness is often
 4    misunderstood?
 5       A.   As a woman, particularly, yes.  It is
 6    specifically hard for women because we, for all of the
 7    reasons that I hope we understand.
 8       Q.   Outside of your experience working at R Street,
 9    have you had experiences where people felt you were
10    being hypercritical or combative or adversarial when
11    that was not your intention?
12       A.   Not really, no.
13       Q.   No.  Okay.
14       A.   I'm known for being blunt, but not combative or
15    hypercritical or whatever, no.
16       Q.   Has your bluntness caused you to have
17    miscommunications that you attribute to your diagnosis?
18       A.   That's difficult to characterize.
19    Miscommunications, who knows what the source of that, it
20    would depend on.
21       Q.   No.  I'm just -- I'm asking for your best
22    perception.  You've been, I presume you've been living
23    with your autism diagnosis for your entire life; am I
24    right so far?
```

Page 295

1    A.  Well, no, because we didn't diagnose it as a
2    child.  Like, a variety -- I didn't find out until I was
3    35, or something like that.
4    Q.  I probably didn't ask a great question.  You've
5    had autism your entire life?
6    A.  Yes.  I mean, I believe so, yes.  I think it's
7    important.
8    Q.  As you look back, you know, I guess it wasn't
9    diagnosed until your 30s, but as you look back into your
10   life experience do you feel that there were occasions
11   where you had interpersonal challenges or
12   miscommunications that were attributable to your autism
13   diagnosis?
14   A.  I think it's possible.  But I don't know whether
15   they were attributable to my diagnosis or whether they
16   were attributable to some other factor.
17   Q.  Okay.  Did you disclose your autism diagnosis to
18   R Street?
19   A.  I did not disclose it.
20   Q.  Did you disclose it to any individual employed by
21   R Street?
22   A.  I don't believe I did, no.  There's a mower
23   outside of my window, so if it gets loud, I don't know
24   if you can hear it.

Page 448

1  Q. That was my next question. So you're continuing
2  to feel emotional distress?
3  A. Sure.
4  Q. What would you describe your emotional distress
5  in November of 2021?
6  A. Oh, what do you mean by "what would I describe
7  it?"
8  Q. On a scale of 1 to 10; 10 being the worst.
9  A. Right afterwards? A 10.
10 Q. Okay. And in the more than two years it's gone
11 from a 10 to an 8; is that your testimony?
12 A. I would say it was an average 8. Now I think
13 that I'm, you know, have some income and actively
14 engaged in being able to help myself in a different way.
15 It's probably a 5.
16     I still -- I mean, I'm not making anywhere near
17 what I'm making, I'm living in a tiny one-bedroom
18 apartment, which is all I can afford. My daughter is
19 still not going to college as a result of this. And so
20 I think there are a lot of knock on effects that
21 happened.
22 Q. Okay. Given that you've testified that you were
23 experiencing 10 out of 10 emotional distress, why did
24 you not seek treatment for your emotional distress?

Page 449

1    A.   Mostly because it was still during the pandemic
2  and finding any kind of therapist was very difficult.  A
3  lot of places weren't taking them.
4    Q.   Did you look for a therapist?
5    A.   I did.  I mean, I got someone to prescribe me a
6  prescription for medical marijuana for the anxiety I was
7  feeling.  I went to a doctor for that.
8         But I didn't go to a therapist also because I
9  knew it was situational and it was a matter of, I mean,
10 they're going to put me on some kind of antidepressant
11 and I don't take those kinds of medications.
12        So there was nothing for me to do other than to
13 figure out how to pick the pieces up and try to put my
14 life back together.
15   Q.   I have a couple of questions about that.  So when
16 you describe your distress as situational, are you
17 saying that you knew eventually your distress would
18 resolve and so you didn't want to seek treatment?
19   A.   It's not that I didn't want to seek treatment.
20 It was that it would be difficult to find it and then
21 to, you know, to be able to continue with it.
22        And there would also have been a cost associated
23 with it and I was holding on to every penny as best I
24 could and dipping in already to my 401(k) and trying to

Page 507

1                         CERTIFICATE
2
3    COMMONWEALTH OF MASSACHUSETTS
4    SUFFOLK, ss.
5
6        I, Laurie Langer, Registered Professional Reporter
     and Notary Public in and for the Commonwealth of
7    Massachusetts, do hereby certify that the witness whose
     deposition is hereinbefore set forth, was duly sworn by
8    me and that such deposition is a true record of the
     testimony given by the witness.
9
10
         I further certify that I am neither related to or
11   employed by any of the parties in or counsel to this
     action, nor am I financially interested in the outcome
12   of this action.
13
         In witness whereof, I have hereunto set my hand and
14   seal this 6th day of July, 2023.
15
16
17
18                        NOTARY PUBLIC
                          Commission Expires
19                        7/27/2023
20
21
22
23
24

1  Deborah McKenna, Esq.
2  dmckenna@hayberlawfirm.com
3                    July 7, 2023
4  RE: LAUREN ROLLINS vs. R STREET INSTITUTE
5     6/23/2023, Lauren Rollins (#5979770)
6     The above-referenced transcript is available for
7  review.
8     Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 cs-ny@veritext.com.
16
17    Return completed errata within 30 days from
18 receipt of testimony.
19    If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22              Yours,
23              Veritext Legal Solutions
24

Page 509

1  LAUREN ROLLINS vs. R STREET INSTITUTE
2  6/23/2023 - Lauren Rollins (#5979770)
3                 E R R A T A   S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____    _____
24 Lauren Rollins                    Date

Page 510

1  LAUREN ROLLINS vs. R STREET INSTITUTE
2  6/23/2023 - Lauren Rollins (#5979770)
3              ACKNOWLEDGEMENT OF DEPONENT
4     I, Lauren Rollins, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11  _____    _____
12  Lauren Rollins                    Date
13  *If notary is required
14              SUBSCRIBED AND SWORN TO BEFORE ME THIS
15       _____ DAY OF _____, 20___.
16
17
18              _____
19              NOTARY PUBLIC
20
21
22
23
24

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.