LAUREN ROLLINS,

      Plaintiff,

v.

R STREET INSTITUTE,

      Defendant.

Civil Action: 3:22-cv-30059-MGM

## R STREET INSTITUTE'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

R Street Institute ("R Street") is entitled to summary judgment as to Counts I and II of the Complaint ("*Compl.*") of Plaintiff Lauren Rollins ("Rollins") for violations of the Federal Equal Pay Act ("FEPA") and Massachusetts Equal Pay Act ("MEPA"), respectively, because no reasonable jury could conclude that Plaintiff received lesser compensation than a <u>valid</u> male comparator or that any such disparity was not supported by legitimate differences in experience.

## FACTUAL SUMMARY[1]

### A.    Parties' Relationship

Rollins is a former employee of R Street, a nonprofit, nonpartisan think tank that is dedicated to promoting pragmatic, free-market solutions to public policy problems.  SOF, ¶ 1.  R Street has eight policy areas of focus, each with a dedicated program director (sometimes referred to as policy directors) who oversees individual subject matter experts and their policy projects.  SOF, ¶ 2.  R Street's policy groups are each supported by teams of staff members, described internally as "shared services," who perform functions ranging from editing publications to financial management to public relations to people operations.  SOF, ¶ 3.

---

[1] This factual summary is composed of key facts within R Street's *Statement of Undisputed Material Facts*, which contains further factual support for its motion for summary judgement.

R Street generally advances its policy positions through research, public commentary, and government outreach. SOF, ¶ 6.  Most of R Street's materials are oriented towards commentary, generally expressed through op-eds and blog postings, and outreach to policymakers and policy influencers though coalition letters, testimony, regulatory comments, congressional letters, and amicus briefs rather than academic publication.  SOF, ¶ 6.  R Street also produces a limited volume of original research in the form of policy studies.  *Id.*  The research conducted by R Street is considered policy research rather than academic research.  *Id.*

**B.      Rollins' Education and Experience Prior to Joining R Street**

Rollins began working for R Street in June 2017 as an Editorial Manager, a shared services positions, at a salary of $80,000.  SOF, ¶ 9.  At the time Rollins applied to work for R Street she was a Ph.D. student at University of Massachusetts Amherst ("UMass"), where her scholarship focused on English rhetoric during the Tudor and Stuart eras between 1485 and 1714. SOF, ¶ 10.

Prior to arriving at R Street, Rollins has spent most of her adult life as a part-time or full-time student.  She spent nearly ten years (January 1998-May 2007) and obtained a bachelor's degree in Government and International Politics in August 2005 and then a bachelor's degree in English in 2007 from George Mason University.  SOF, ¶ 11.  After unsuccessfully applying to Ph.D. programs in the fall of 2007, Rollins began attending Georgetown University in January 2008 and obtained a master's degree in English in May 2010.  SOF, ¶ 13.  Rollins then taught a variety of writing and literature classes at two community colleges between August 2010 and August 2011.  SOF, ¶ 14.

Rollins began her Ph.D. program at UMass in August 2011.  SOF, ¶ 15.  From June 2015 until she joined R Street, Rollins also served as a fellow for English Literary Renaissance, an

academic journal at UMass publishing three times per year.  SOF, ¶ 18.  Rollins abandoned her Ph.D. program to join R Street because she felt her academic prospects were bleak.  SOF, ¶ 17.

Outside of her academic experience, Rollins had two summer long positions that she considers management experience.  In the summer of 2009, shortly after graduating college, Rollins served as the program director for two summer conference cycles for high-school aged students.  SOF, ¶ 22.  In this role, Rollins hired, trained, and managed a staff of 22 faculty advisors and program operators for a few months.  *Id*.  In 2013, Rollins served as the academic director of a summer program for matriculating high school students.  SOF, ¶ 23.  In this role, Rollins hired and managed a staff of 15 college-level instructors for several months.  *Id*.

Rollins has no formal management training.  SOF, ¶ 19.  She also has no professional journalism or journalistic editing experience.  SOF, ¶ 20.  Prior to joining R Street, Rollins had no professional policy experience and had never supervised a single year-round fulltime employee.  SOF, ¶ 21.

**C.    R.J. Lehmann's Experience and Employment at R Street**

Rollins' direct supervisor as Editorial Manager was the then Editor-in-Chief ("EIC") and Senior Fellow Ray Lehmann, who was earning $135,000 in that role.  SOF, ¶ 25.  Lehmann co-founded R Street in June 2012, having previously served as deputy director of the Heartland Institute's Center on Finance, Insurance and Real Estate.  SOF, ¶ 26.  Before joining Heartland, Lehmann had spent more than eight years covering the insurance and financial services industries for two major trade publications.  SOF, ¶ 27.  Before this insurance-focused work, Lehmann had been the Public Affairs Director of another think tank with a mission similar to R Street's.  SOF, ¶ 28.  Lehmann also had more than a decade of experience as a journalist and editor prior to beginning at R Street.  SOF, ¶ 29.

Lehmann first began working for R Street as its Public Affairs Director and a Senior Fellow, where he was responsible for serving as the organization's chief spokesman, editing all work done by R Street, and serving as a de-facto policy director in the area of insurance policy. SOF, ¶¶ 30-34. In February 2014, Lehmann assumed the title of EIC, which reflected his increased focus on R Street's editorial function, but he continued to oversee media relations and informally contribute to that function as well as significant donor relations responsibilities. SOF, ¶¶ 35, 46. As EIC, Lehmann continued to be solely responsible for the editorial function of R Street, personally editing all materials being produced by R Street. SOF, ¶ 36. As EIC, Lehmann also continued to be a de-facto policy director as he was responsible for managing R Street's Right Street blog at insurancejournal.com and authoring the majority of pieces that appeared there and authoring R Street's annual Report Card, other policy studies, public comments, and testimony particularly in the area of insurance regulation. SOF, ¶ 37. Indeed, in 2017 alone, Lehmann authored or co-authored seven policy studies and 45 pieces of commentary and also testified before the United States House of Representatives' Financial Services Committee on the subject of flood insurance reform. SOF, ¶¶ 44-45.

As EIC, Lehmann was a "department of one" in that he personally edited all R Street content. SOF, ¶ 48. Lehmann took a journalistic approach to editing, which emphasized speed, clarity, and persuasiveness, and, as a result of his deep and varied policy expertise, he also often substantively contributed to the work he was editing. SOF, ¶¶ 49-50.

**D.**     **Rollins' Employment as Editorial Director/Director of Research Publications**

In January 2018 Lehmann became the official Program Director for the Finance, Insurance, and Trade Policy group at R Street. SOF, ¶ 53. As a result, Rollins became Editorial Director and was responsible for creating a house style guide, creating publication submission

guidelines, and working in coordination with others to streamline workflow processes. SOF, ¶ 60. In this position, Rollins edited policy studies but did not generally directly edit other R Street materials. SOF, ¶ 61. Rollins initially supervised two editors and added a third in October 2018. SOF, ¶ 59.

During her first year in her role as Editorial Director, Rollins gradually implemented editorial procedures that aligned with her academic background and departed from Lehmann's more journalism-based process. SOF, ¶ 63. For instance, she reimagined her role as "maintaining and ensuring the quality and rigor of the research" by training staff on research methods and conducting "peer-review" of R Street policy studies. SOF, ¶¶ 62-63. In October 2018, Rollins revised the job description for Editorial Director to reflect the new responsibilities she had designed for herself including strategically managing R Street's editorial calendar and providing, in coordination with communications director, ground-level risk management related to R Street's content and scholarly rigor. SOF, ¶ 64. By 2019, Rollins had created a more formal editorial process with an established workflow and her overseeing an editorial staff that performed the vast majority of the direct editing. SOF, ¶ 67.

In January 2019, Rollins received another salary increase from $86,700 to $100,000. SOF, ¶ 66. She continued to perform very little direct editing as Editorial Director and the editing she did perform was limited to policy studies. SOF, ¶¶ 61, 69. When she did edit materials, Rollins did not substantively contribute to the pieces she edited because she lacked the policy expertise to make such contributions. SOF, ¶ 68. In March 2020, R Street increased Rollins' salary to $110,000. SOF, ¶ 83. In July 2020, Rollins' title changed from Editorial Director to Director of Research Publications, but her responsibilities did not change. SOF, ¶ 84.

**E.** **Mazen Saleh's Employment as Associate Vice President of Policy**

R Steet hired Mazen Saleh in October 2019 as AVP of Policy Management.  SOF, ¶ 74. Before joining R Street, Saleh had over ten years of senior management experience and had supervised more than 25 fulltime employees in that time.  SOF, ¶¶ 77-80.  He also had been deeply involved in the financial management and business development aspects of those organizations.  SOF, ¶ 77.

As AVP of Policy Management, Saleh was responsible for overseeing the execution and financial performance of policy operations and the editorial department.  SOF, ¶ 76.  He was also responsible for coaching, mentoring, and counseling policy directors and their teams to support them in achieving their revenue and impact goals.  *Id*.  He was also responsible for establishing, calibrating, and automating processes/metrics to execute annual policy priorities.  *Id*.  Saleh earned a salary of $160,000 in this role. SOF, ¶ 75.  Over his tenure as AVP, the organization evolved and became more strategic and, as a result, Saleh's existing portfolio management responsibilities deepened and expanded, as he took on new duties in portfolio and knowledge management, and more sophisticated strategic planning.  SOF, ¶ 85.

## F.      **Bifurcation of Mazen Saleh's Role as Associate Vice President of Policy**

In late 2020, the combined pressures associated with the COVID pandemic and the near complete turnover of the policy leadership team - at one point Saleh was serving as policy director for three groups - strained his ability to effectively perform those duties.  SOF, ¶ 86.  In October 2020, Rollins approached Saleh with a proposal to take on some of his responsibilities to help him manage his workload.  SOF, ¶ 87.  Specifically, she proposed taking over the day-to-day management of policy directors.  *Id*.  Saleh brought to the Executive Team a plan to bifurcate his role, so that Saleh would focus on his portfolio management responsibilities while Rollins would focus on the day-to-day duties of policy management.  SOF, ¶ 88.  The Executive

Team generally agreed with this proposal, but left it to Saleh and Rollins work out the specific division of responsibilities.  SOF, ¶ 89.

In her new role as AVP of Research Programs, Rollins oversaw R Street's policy leadership and publications teams to ensure effective leadership and management practices, sound fundraising and financial management, integration and collaboration, and the development and implementation of useful impact metrics.  SOF, ¶ 91.  She was also responsible for guiding the policy team's professional development and career planning efforts, and served as the internal liaison both between the various policy teams and between policy and shared services.  *Id.*

In his new role as AVP of Portfolio Management, Saleh was expected to better align incentives within policy, conduct portfolio/strategic reviews of individual programs, ensure a healthy culture in policy, better define roles and responsibilities, and build overall systems and structures. SOF, ¶ 93.  He was also responsible for the overall strategy, scope of work within programs, and sustainability of policy at the organization.  SOF, ¶ 94.  His primary focus shifted to budgeting and finance at the highest level within programs.  *Id.*  This included planning and administration including the evolving strategy of R Street's program mix and relations between programs and within their portfolios.  *Id.*  He also oversaw strategic initiatives such as the automation of grant deliverables tracking, formalization of professional and career development within policy (including standardization of titles and creating clear and transparent pathways for internal promotion), and DEI implementation across these departments.  *Id.*

G.    **Portfolio Management Responsibilities Following Saleh's Transition to a Policy Role**

In June 2021, Saleh decided to transition from AVP of Portfolio Management to become the Policy Director for Integrated Harm Reduction.  SOF, ¶ 98.  The Executive Team tasked Schoder and AVP of Strategy Justina Yee with devising a new approach to portfolio

management.  SOF, ¶ 99.  Schoder and Yee's portfolio management approach was adopted in

July 2021 and Saleh's responsibilities were distributed as follows:

| Responsibility | Employee |
|---|---|
| Overall portfolio management | Justina Yee |
| Deliverables Tracking (Salesforce Policy Implementation) | Put on hold/not distributed |
| Strategic Planning & Assessment (Impact): | Justina Yee and Rebecca Kendall |
| Funding Priorities, Programmatic fundraising goals, Incentives, and Surplus | Ginny Mansour |
| Financial Management | Justina Yee |
| Donor care plans and donor management | Ginny Mansour |
| Hiring and Contracting within Policy Groups | Lauren Rollins |
| Defining Expertise and Career Pathways | Put on hold/not distributed |

SOF, ¶¶ 100-106.

When Yee resigned in September 2021, Kendall assumed Yee's previous role of

"owning" the process for each policy area to set their respective strategy with Rollins remaining

the accountability owner for making sure that process was being followed.  SOF, ¶¶ 108-112.

Schoder ultimately decided not to immediately hire a new AVP of Strategy and rather to

temporarily take on portfolio management responsibilities herself in order to assess

organizational needs and give existing staff the opportunity to take on more responsibilities.

SOF, ¶ 111.  R Street terminated Rollins' employment on October 21, 2021.  SOF ¶ 115.

## ARGUMENT

### I.  STANDARD OF REVIEW

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and the moving party is entitled to a judgment as a matter of law." *Frankina

v. First Nat'l Bank*, 801 F. Supp. 875, 879 (D. Mass 1992); *citing Fed. R. Civ. P.* 56(c).  A party

opposing summary judgment cannot rely upon hearsay or "unsupported statements of belief." *Flesner v. Tech. Commc'ns Corp.*, 410 Mass. 805, 818 (1991). An issue is "genuine" when a <u>reasonable factfinder</u> could resolve it in favor of the nonmoving party. *Foss v. Marvic*, 424 F. Supp. 3d 158, 160 (D. Mass. 2019) (emphasis added). The mere existence of <u>some</u> alleged factual dispute will not defeat a properly supported summary judgment motion, however. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-252 (1986). Rather, the non-moving party must "affirmatively point to specific facts that demonstrate the existence of an authentic dispute." *Melanson v. Browning-Ferris Indus.*, 281 F.3d 272, 276 (1st Cir. 2002).

## II.   R STREET IS ENTITLED TO SUMMARY JUDGMENT ON ROLLINS' MEPA CLAIM (COUNT II).

MEPA provides that "[n]o employer shall discriminate in any way on the basis of gender in the payment of wages, or pay any person in its employ a salary or wage rate less than the rates paid to its employees of a different gender for comparable work." G.L. c. 149, §105A. Notably, the focus is on the "'responsibilities and functions of [each] position' rather than relying solely on the job titles." *Gu v. Boston Police Dept.,* 312 F.3d 6, 16 (1st Cir. 2002). Notwithstanding the 2018 amendments to the statute, the standard for whether work is "comparable" remains subject to the two-step analysis set forth in *Jancey v. School Comm'n of Everett*, 658 N.E.2d 162 (Mass. 1995). *See Lee v. Howard Hughes Med. Inst.*, 607 F. Supp. 3d 52, 68 (D. Mass 2022) (applying the two-part test to a post-2018-amendment MEPA claim in granting summary judgment to the employer after finding that all the male comparators relied upon by the plaintiff were "plainly inapposite.").[2] "At the first step, the Court inquires as to whether the substantive

---

[2] Prior to the 2018 amendment, MEPA prohibited gender pay differences "for work of like or comparable character or work on comparable operations." G. L. c. 149, § 105A (1994 ed.) The Massachusetts Supreme Judicial Court in *Jancey v. School Comm.*, 421 Mass. 482 (1995) determined that the "comparable character or work" standard required a two-part analysis which inquired first "whether the substantive content of the jobs is comparable" and then whether the positions entail "comparable skill, effort, responsibility, and working conditions." *Id.* at 489-90.

content of the jobs is comparable, that is, whether the duties of the jobs have important common characteristics." *Id.* If so, the Court then considers whether the two positions entail substantially similar skill, effort, responsibility, and working conditions. *Id.* "Only if both questions are answered affirmatively is the employer obligated to compensate the employees equally." *Id.* If the *prima facie* case is established, an employer can avoid liability by demonstrating that disparity in pay is based upon, *inter alia*, seniority, merit, education, training and experience. M.G.L. c. 149, § 105A(b).

Rollins' MEPA claim cannot survive summary judgment for two, independent reasons. First, Rollins cannot establish a *prima facie* showing that R Street paid her lower compensation than a valid comparator.[3] Second, any discrepancy in compensation between Rollins and Lehmann or Rollins and Saleh (her only conceivable comparators) were based on permissible factors under MEPA, including differences in their relevant experience.

**A.** **Rollins Cannot Establish A *Prima Facie* Violation Under MEPA Because She Cannot Identify A Valid Comparator.**

**1.** **Lehmann's EIC Position and Rollins' Editorial Director/Director of Research Publication Position are Not Comparable.**

As an initial matter, Rollins' and Lehmann's respective roles plainly lacked "common characteristics." First, Lehmann was a Senior Fellow and de-facto policy director in 2017. SOF,

---

The 2018 amendment narrowed the permissible reasons for pay disparities and also replaced the phrase "work of like or comparable character or work on comparable operations" with "comparable work" which it defined as "work that is substantially similar in that it requires substantially similar skill, effort and responsibility and is performed under similar working conditions." G. L. c. 149, § 105A. The Massachusetts Attorney General's guidance states that the revised statutory definition eliminated the two-part comparability test. MA Att'y Gen. Guidance (Mar. 1, 2018) at 5 n.3. However, that view was not adopted in *Lee v. Howard Hughes Med. Inst.*, 607 F. Supp. 3d 52, 68 (D. Mass 2022). In any case, R Street is entitled to summary judgment under either standard.

[3] Because Rollins essentially asserts three distinct pay equity claims, the Court should analyze each separately. *See, e.g., Doe v. Williams Coll.*, 530 F. Supp. 3d 92, 122 (D. Mass. 2021) (granting summary judgment on all portions of breach of contract claim except one due to narrow issue of fact); *Zadworny v. Potter*, 2008 U.S. Dist. LEXIS 134009, at *29 (D. Mass. Jun. 26, 2008) (Granting summary judgment on retaliation claim relating to plaintiff's job as a custodian while denying motion with respect to plaintiff's job as a clerk for same employer).

¶ 37.  He was responsible for managing R Street's "Right Street" blog at insurancejournal.com and authoring the majority of pieces that appeared there as well as authoring R Street's annual Report Card, other policy studies, public comments, and testimony, particularly in the area of insurance regulation.  *Id*.  In 2017 alone, Lehmann authored or co-authored seven policy studies, 45 pieces of commentary, and three government outreach pieces, and he also testified before the United States House of Representatives' Financial Services Committee on the subject of flood insurance reform.  SOF, ¶¶ 42, 44-45.  In contrast, Rollins did not have policy writing responsibilities in her role as Editorial Director/Director of Research Publications.  SOF, ¶¶ 8, 41, 43, 57, 60, 64, 84, 113.  In fact, during the entirety of her career at R Steet, Rollins only authored a single outreach piece in September 2019 when she offered testimony to the Massachusetts Joint Committee on Public Health, co-authored a single op-ed concerning the World Trade Organization, and authored a non-policy op-ed expressing her private political opinions.  SOF, ¶¶ 41, 43.  The fact that Lehmann's role as EIC entailed substantial policy writing responsibilities that Rollins did not is, by itself, sufficient to conclude their positions did not share common characteristics.  *See, e.g., Hein v. Oregon College of Education*, 718 F.2d 910, 914 (9th Cir. 1983) (reversing decision that female and male teachers had comparable job where the male teacher spent 25 percent of his time coaching and the female teacher had no coaching responsibilities because "a coaching job plainly requires skills that a noncoaching job does not.")

Lehmann also had significant donor relations responsibilities as EIC.  SOF, ¶ 46.  For instance, Lehmann dealt with individuals and organizations within the insurance industry including many of R Street's longest standing supporters and R Street board members.  *Id*.  Conversely, Rollins was not expected to be involved in fundraising/donor relations activities as Editorial Director/Director of Research Publications.  SOF, ¶¶ 8, 41, 43, 57, 60, 64, 84, 113.

Lehmann also continued to have public relations responsibilities in his role as EIC. SOF, ¶ 35. He continued to oversee media relations, including supervising the Director of Communications. *Id.* In contrast, Rollins had no media relations responsibilities in her role as Editorial Director/Director of Research Publications. SOF, ¶¶ 8, 41, 43, 57, 60, 64, 84, 113.

Finally, even Lehmann's and Rollins' editorial responsibilities were markedly different.[4] Lehmann was a "department of one" who personally edited all R Street content. SOF, ¶ 48. He would also often substantially contribute to pieces as a result of his deep and varied policy experience. SOF, ¶ 50. In contrast, in her role as Editorial Director/Director of Research Publications, Rollins generally oversaw the overall workflow of the department and supervised an editorial staff that was performing the great bulk of the direct editing of pieces. SOF, ¶¶ 59-64, 67-70. Indeed, Rollins performed very little direct editing, which she confined to research papers, and did not substantively contribute to the work. SOF, ¶¶ 61, 68-70.

Rollins will likely contend that the Editorial Director/Director of Research Publications role, which she redesigned to reflect what she regards as her superior academic credentials relative to Lehmann, was more valuable to the organization. Indeed, Rollins will likely argue at trial that R Street undervalued her role and the improvements she had made to its editorial function. However, the subjective merit or value of a particular position is irrelevant to the MEPA analysis. The sole question before this Court in this motion is whether the editorial roles performed by Lehmann and Rollins were comparable. The answer is plainly that the roles were quite different. One was a direct and substantive journalistic-style editor and one was a manager

---

[4] Courts have consistently held that a predecessor sharing the same title is not a valid comparator where they performed different duties. *See, e.g., Ingram v. Brink's, Inc.*, 414 F.3d 222, 233 (1st Cir. 2005) (affirming summary judgment for employer where male predecessor performed management functions while the plaintiff performed primarily administrative functions upon assuming the role); *Tenkku v. Normandy Bank*, 348 F.3d 737, 741 (8th Cir. 2003) (affirming summary judgment for employer because plaintiff's "total work responsibilities were not equivalent to those performed by" her male predecessor where defendant submitted evidence that the male predecessor's duties "included numerous functions in addition" to those completed by plaintiff despite plaintiff assuming some of the predecessor's duties).

of a more formal and academic editorial process.  Thus, on the "common characteristics" prong of the analysis alone, R Street is entitled to summary judgment.

To the extent that the Court considers whether the two positions entail "substantially similar skill, effort, responsibility, and working conditions," for all of the reasons set forth above they plainly did not.  The skills, defined by the Massachusetts Attorney General as "the experience, training, education, and ability required to perform the jobs," were almost entirely distinct.  According to Rollins, her position required her to use her background in qualitative research production to increase the quality and rigor of R Street's research products and manage an editorial workflow for a team of editors.  SOF, ¶¶ 62, 67.  In contrast, Lehmann's role did not require him to have academic training in qualitative research, but rather the journalism and policy skills necessary to personally edit an enormous volume of R Street material, often substantively.  SOF, ¶¶ 47-50.  Lehmann's vast journalism and policy background provided him with the experience, training, and ability required to perform his job.  SOF, ¶¶ 27-29, 47-50.

And these substantial differences in the skills needed to perform the editorial aspect of the role, pale in comparison to the differences in the other aspects of Lehmann's role.  His years of policy experience allowed him to be the de facto director of R Street's insurance group, a significant aspect of his role in 2017 and prior years.  SOF, ¶¶ 26-29, 34, 37-44.  In contrast, Rollins was not required in her role to meaningfully contribute to R Street's policy work (and lacked any policy experience that would allow her to do so).  SOF, ¶¶ 8, 41, 43, 57, 60, 64, 68, 84, 113.  Finally, Lehmann's experience as the Public Affairs Director of the Independence Institute and later Public Affairs Director at R Street allowed him to oversee media relations and informally contribute to that function as an EIC, while Rollins lacked the experience to perform this role and was not expected to do so.  SOF, ¶¶ 26-28, 31, 35,57, 60, 64, 68, 84, 113.

Accordingly, R Street is entitled to summary judgment on Rollins' pay equity claim for the period she was working as R Street's Editorial Director/Director of Research Publications from May 2019 until February 2021.

### 2. Saleh's AVP of Portfolio Management Position and Rollins' AVP of Research Programs Position are Not Comparable. [5]

The analysis of Rollins' claim relating to the role she performed between February 2021 and July 2021 is even more straightforward. Rollins and Saleh quite literally "bifurcated" the role in order to have minimal overlap in responsibilities. The roles had functionally no "common characteristics" as one was devoted to the day-to-day management of policy directors while the other was devoted to portfolio management and supervising Rollins. SOF, ¶¶ 88-95.

Rollins' apparent rejoinder is to claim that she took on a greater percentage of Saleh's prior responsibilities and that he should have actually had his pay reduced for giving up some of his responsibilities. But this contention is, in addition to false, irrelevant. While Rollins may believe that she was underpaid in her role as AVP of Research Programs or that her role was more valuable than Saleh's, those issues are immaterial to whether the positions were comparable. Indeed, courts have rejected the notion that an equal pay claim can be based on allegations of "comparable worth" or similar "impact" between roles. This is particularly true in situations where, as here, the comparison involves individuals in nonstandardized, high-level positions where pay equity "because such positions do not, almost by definition, require equal skill, effort, and responsibility, performed under equal working conditions." *Calicchio v. Oasis Outsourcing Group Holdings, L.P.*, 584 F. Supp. 3d 1215, 1237-38 (S.D. Fla. 2021); *see*

---

[5] Rollins' Complaint makes clear she views Saleh as her comparator during her time as AVP of Research Programs. However, Rollins suggested in her deposition that R Street's AVP of Strategy might be an appropriate comparator. For the sake of completeness, R Street has provided ample evidence in its Statement of Facts that those two roles were also entirely distinct.

*Georgen-Saad v. Tex. Mut. Ins. Co.*, 195 F. Supp. 2d 853, 857 (W.D. Tex. 2002) ("These are Senior Vice Presidents in charge of different aspects of Defendant's operations; these are not assembly-line workers or customer-service representatives. In the case of such lower-level workers, the goals of the Equal Pay Act can be accomplished due to the fact that these types of workers perform commodity-like work and, therefore, should be paid commodity-like salaries. However, the practical realities of hiring and compensating high-level executives deal a fatal blow to Equal Pay Act claims. In cases such as these, no judge or jury should be allowed to second guess the complex remuneration decisions of businesses that necessarily involve a unique assessment of experience, training, ability, education, interpersonal skills, market forces, performance, tenure, etc. Requiring Defendant and other companies to either pay senior executives the same amount or to come to court to justify their failure to do so is simply beyond the pale."). Because Saleh's and Rollins' responsibilities were so different, Plaintiff's only basis for her contention that they were comparable appears to be the fact that they both held AVP titles. But it is well settled that the focus of the analysis is on the "'responsibilities and functions of [each] position' rather than relying solely on the job titles." *See Gu*, 312 F. 3d at 16.

Finally, their respective positions required different skills. Saleh's portfolio management role required him to have skills in financial management and business development, assessing impact on donor engagement and revenues, employing business case assessments and processes, and strategic planning that he had developed through his more than decade of experience with his prior employers. SOF, ¶¶ 77-80, 93-94. Rollins' position did not require her to have any of those skills. SOF, ¶¶ 91-92. She took on the role of being the day-to-day manager of the policy teams, which she described in an unguarded moment as a "fully administrative function of reviews and holding people accountable." SOF, ¶ 114. While some of that supervision included

implementation of strategy or portfolio management initiatives, those processes were designed by and owned by the AVP of Portfolio Management (Saleh) and the AVP of Strategy (Justina Yee). Rollins was not expected to drive portfolio management or strategy initiatives and lacked the skills to do so.

### 3. Rollins' position after July 2021 Remained Distinguishable From Saleh's AVP of Policy Management position.

Rollins' own Complaint concedes that not all of Saleh's responsibilities were reassigned to her when Saleh transitioned to a policy role.[6] *Compl.* at ¶ 40. She acknowledges that the AVP of Strategy, Justina Yee and Manager of Strategic Initiatives, Rebecca Kendall took on some of his responsibilities. *Id.* In fact, Schoder and Yee collaborated on a new approach to portfolio management, which resulted in Virginia "Ginny" Mansour, R Street's Director of Business Development, and Yee assuming the bulk of Saleh's responsibilities. SOF, ¶¶ 99-106. They also determined that Kendall would take on the organizational impact measurement aspect of portfolio management. *Id.* Finally, R Steet planned to hire a business analyst who would focus on program alignment, business research and impact as well as a program director to support Rollins with the day-to-day supervision of policy directors. *Id.* Thus, the undisputed facts show that Saleh's AVP of Policy Management responsibilities were not consolidated under Rollins upon his transition and that any added responsibilities she took on after July 2021 were intentionally temporary until R Street hired a new business analyst and program director.

Yee's departure in September 2021 also did not result in Rollins assuming substantially more responsibilities and certainly not on a permanent basis. Rollins conceded at her deposition that there was no firm plan on how to distribute Yee's responsibilities as of her Rollins'

---

[6] Rollins claims that she is actually entitled to the salary Kevin Kosar earned as VP of Policy two years earlier because Saleh's responsibilities as AVP of Policy Management were the same as Kosar's. *Compl.* ¶¶ 32, 35. She offers no explanation why, even if this were true, an organization that pays a male less than prior male for the same role would then be liable for the difference between that first male's salary and a later female employee's salary.

termination. SOF, ¶ 111. In fact, the one responsibility Rollins claims she took on, policy strategy, is demonstrably false. When Yee resigned, Kendall assumed the role of "owning" the process for each policy area to set their respective strategy with Rollins remaining the accountability owner for making sure that process was being followed. SOF, ¶ 112.

**B.**     <u>To the Extent Rollins Can Identify A Valid Comparator, the Pay Disparities Were Based On Differences in Training and Experience Reasonably Related to the Particular Job and Consistent with Business Necessity</u>

Even assuming Rollins can identify a valid comparator, which she cannot, R Street was permitted to compensate those individuals differently based on their significant differences in training and experience. MEPA expressly permits variations in pay based on certain factors, such as "education, training, or experience to the extent such factors are reasonably related to the particular job in question." *See* G.L. c. 149, §105A. *See Silvestris v. Tantasqua Reg'l Sch. Dist.*, 446 Mass. 756, 771 (2006) ("the plain language of G.L. c. 149, §105A, allows for variations in rates of pay…and demonstrates the Legislature's recognition that employers may offer different levels of compensation based on the prior experience of their prospective employees"). Similarly, the AG has explained that it is permissible to pay one employee more than another where "a reasonable employer could have concluded that such education, training, or experience would help the employee to perform the particular job in a more efficient or more effective manner." MA Att'y Gen. Guidance (Mar. 1, 2018) at 10.

With respect to Rollins' Editorial Director/Director of Research Program role, even if Lehmann's position was solely that of an editor, as of 2017 Lehmann had been successfully serving R Street's EIC for <u>five years</u>, which alone would warrant the pay differential. Moreover, his more than ten years of experience as a journalist and newspaper editor prior to joining R Street plainly provided him superior experience and practical training to edit R Street materials

in comparison to Rollins' three years as a part-time junior editor of an academic literary journal that was published a few times a year. Rollins also ignores that Lehmann had also spent more than eight years in the policy sphere covering the insurance and financial services industries, first as manager of A.M. Best Co.'s Washington bureau and later as a senior industry editor with SNL Financial, whereas Rollins had no policy experience. There is simply no comparison between Rollins' and Lehmann's relative experience, much as Rollins seeks to inflate the significance of the research training she received as part of her unsuccessful bid to earn an English Ph.D. *See, e.g., Hizer v. South Bend Tribune*, 2012 U.S. Dist. LEXIS 24597 at *12 (N.D. Ind. Feb. 24, 2012) (granting summary judgment to employer against FEPA claim despite the plaintiff sharing some writing and editing duties with her male comparators because "they [were] not alike in their educational background, the length of employment with Defendant, the level of supervisory authority, and the number of pages produced"). The significant gap between Lehmann's and Rollins' editorial experience easily justifies the $35,000 (reduced to $25,000 as of March 2020) annual salary differential even ignoring his other responsibilities.

With respect to their relative experience in performing both the portfolio management and policy management aspects of the AVP of Policy role that Rollins claims she began performing in July 2021, Saleh's was plainly superior. Rollins' experience overseeing two summer programs for high school students is in no way comparable to Saleh's more than decade of experience in senior management roles with the Association of American Medical Colleges and later the National League for Nursing. The fact that Rollins even considers her participation in these summer program, the first of which she did as a recent college graduate, show how little actual management experience she had (and why she struggled so profoundly in a management role). The significant gap between Saleh's and Rollins' managerial experience easily justifies

the $20,000 annualized salary differential.  In light of these undisputed facts, no reasonable jury could find that R Street violated MEPA and summary judgment must enter in its favor.

### III.  R STREET IS ENTITLED TO SUMMARY JUDGMENT ON ROLLINS' FEPA CLAIM (COUNT I).

If the Court grants summary judgment to R Street on Rollins' MEPA, it is required to also grant summary judgment on her FEPA claim because the "comparable work" standard is broader and more inclusive than the "equal work" standard under FEPA.  *See Rodriguez v. Smithkline Beecham*, 224 F.3d 1, 6 (1st Cir. 2000) (prima facie case under FEPA requires showing "that the employer paid different wages to a member of the opposite sex for substantially equal work.").  An employer can also rebut this prima facie case by demonstrating that the discrepancy resulted from a pay system based on: (1) seniority; (2) merit; (3) quantity or quality of production; or (4) another differential based on a factor other than sex.  29 U.S.C. § 206(d)(1); *Scott v. Sulzer Carbomedics, Inc.*, 141 F. Supp. 2d 154, 176 (D. Mass. 2001) ("Acceptable factors 'other than sex' include experience, prior salary, education, skills which the employer deems useful to the position, and a proven ability to generate higher revenue for the employer's business.").  "[T]he standard is [] demanding, requiring evidence that the jobs compared are '**substantially equal**.'" *EEOC v. Port Auth. of N.Y. and N.J.*, 768 F.3d 247, 255 (2d Cir. 2014) (emphasis added). FEPA's "demanding standard" requires Plaintiff to prove that the jobs being compared have the same "job content" and "common core of tasks" and do not merely share job classifications or titles.  *See* 29 C.F.R. § 1620.13(e).  Even evidence that a plaintiff shares "some common responsibilities" with her comparators does not suffice. *Chiaramonte v. Animal Med. Ctr.*, 677 Fed. Appx. 689, 691 (2d Cir. 2017).

As set forth above, the undisputed facts show that Rollins did not perform equal work to her purported comparators under any objective evaluation.  In addition to the differences in job

duties, Rollins' positions required vastly different skills and experience than her purported comparators. As such, she cannot meet her *prima facie* burden, and judgment in favor of R Street should be entered for this reason alone. *See Gu*, 312 F.3d at 16-17 (dismissing federal and state equal pay claims when the plaintiffs did not have the same managerial and technical responsibilities as male comparators); *Rodriguez v. Smithkline Beecham*, 224 F.3d 1, 6-7 (1st Cir. 2000) (affirming dismissal of equal pay claim when plaintiff failed to establish that she had comparable responsibilities to male comparator).

In addition, even if Rollins were able to establish a *prima facie* case of pay discrimination, her claim still fails, because the pay disparity between her and her purported comparators is based on factors other than sex. *See, e.g., Girdis v. EEOC*, 688 F. Supp. 40, 45 (D. Mass. 1987). The individuals that Rollins seeks to compare herself to plainly have more relevant experience. *See Akerson v. Pritzker*, 980 F. Supp. 2d 18, 31-33 (D. Mass. 2013) (granting summary judgment because FEPA permits wage discrepancies based on any other factor other than sex including "experience, prior salary, education, skills which the employer deems useful to the position . . .").

In sum, contrary to Rollins' misplaced theory that all editors or all AVPs needed to be paid equally, she did not perform work that was substantially equal in terms of skill, effort, or responsibility to her purported comparators. As such, R Street is entitled to summary judgment on Rollins' FEPA claim.

## **CONCLUSION**

For the foregoing reasons, the Court should GRANT R Street Institute's Partial Motion for Summary Judgment.

Respectfully submitted,

R STREET INSTITUTE

By its attorneys,

/s/ *Benjamin Davis*
Benjamin Davis (BBO# 673017)
JACKSON LEWIS P.C.
75 Park Plaza, 4th Floor
Boston, MA 02116
(617) 367-0025
Benjamin.Davis@Jacksonlewis.com


Dated: September 27, 2023




<u>**CERTIFICATE OF SERVICE**</u>

This hereby certifies that on this 27th day of September 2023, this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ *Benjamin Davis*
Jackson Lewis P.C.


4883-8096-2179, v. 1